I respectfully, albeit reluctantly, dissent from the majority opinion.
Although I agree with the majority's analysis of the "newly discovered evidence;" its correlation (or lack thereof) to the ten rabbits at issue during trial; and the observation the newly discovered evidence appears only valuable for impeachment purposes, nevertheless, I would affirm the decision of the trial court based upon the stringent standard of review to be applied.
At trial, Lesli Humphries, testified she received a complaint from an individual named Patty Pound on June 1, 1998, alleging abuse of rabbits housed on appellant's property at 3386 Henderson School Road, New Philadelphia, Ohio. According to the complainant, the rabbits were living in unsanitary conditions and were being deprived of food and water. Humphries and her assistant, Tammy Durning, visited appellant's residence on June 3, 1998. Upon their arrival at the residence, Humphries and Durning proceeded to the house and knocked on the front door. When no one answered the door, the two humane society officers walked down the driveway toward the pole barn, which housed the rabbits. Humphries testified they did not enter the pole barn, however, they did look into the structure through a small door which was open. The large doors on the backside of the pole barn were also open. Humphries noticed an overwhelming odor of ammonia, feces, and urine emanating from the barn.
Upon looking into the barn, Humphries observed rabbit cages stacked three high with no drop pans, resulting in the rabbits in the top cages defecating and urinating on the rabbits in the lower cages. Humphries also noticed knocked over cages, which sat partially on the ground and partially stacked on other cages. Piles of feces covered the floor. Neither Humphries nor Durning entered the barn. As the two women started toward their vehicle, they encountered appellant's husband, Marvin Brown. Humphries advised Mr. Brown the Humane Society had received a complaint regarding the rabbits and asked him if she and Durning could enter the barn and take photographs. Mr. Brown consented to Humphries' request.
Inside, Humphries observed rows of rabbit cages, which ran the entire length of the barn. She noticed at least a dozen dogs housed in what appeared to be two pig stalls. The entire barn floor was covered with feces. Humphries observed dead rabbits in the barn. She testified she saw the body of one rabbit on the ground in one of the aisles. She also saw a wooden crate which contained numerous dead rabbits. Humphries looked into each cage. She did not observe any food in the food bowls or in the self-feeders which were on some of the cages. The only thing she did observe in the food bowls and feeders was rabbit feces. Humphries also noticed a lack of water and watering devices in the cages. Although she saw a garden hose on the floor of the barn, she stated the hose was buried under feces. She noted this hose was the only device for providing water to the animals. Humphries recalled stepping up to her knees in a pile of feces.
Upon completing the investigation, Humphries issued a written warning to Mr. Brown. Humphries called an emergency meeting of the Humane Society that evening, believing the situation was a matter of life or death for the rabbits. At the meeting, the Humane Society coordinated the efforts to be undertaken in removing the rabbits from appellant's property, and determined a search warrant would be needed. On June 4, 1998, Humphries returned to appellant's property with Sgt. McEnroe of the Tuscarawas County Sheriff's Department and Tammy Durning in order to show Sgt. McEnroe the buildings for which they desired the search warrant. Humphries, Sgt. McEnroe, and Durning found no one at the property. The group walked around the pole barn, however, they did not enter the structure.
On June 5, 1998, Humphries obtained a search warrant which was executed that day. Humphries; Sgt. McEnroe; Karen Slough, the dog warden; Jerry Warren, the assistant dog warden; Tammy Durning; and Beth Budavich, who engages in wildlife rehabilitation, arrived on the property to execute the search warrant. Mr. Brown was present on the property, and Humphries showed him the search warrant. Mr. Brown cooperated with the group, assisting the dog warden in carrying the dogs to the warden's truck. The Humane Society had made arrangements for the animals to be transported to and housed at the Tuscarawas County Fairgrounds. Once at the fairgrounds, a veterinarian examined the rabbits.
Humphries noticed some changes had been made to the barn between her initial visit on June 3, 1998, and June 5, 1998. She testified the dead rabbits were no longer in the barn. Additionally, a row of cages which had been hanging from the ceiling had been relocated to the floor. Humphries recalled she personally removed thirty or forty rabbits from the barn. She noticed the rabbits felt thin, and also observed some of the rabbits had matting around their rear-ends. All of the rabbits smelled of urine. Many of the rabbits were sneezing and had discharge coming from their noses and eyes. Humphries did not see any food in the cages on that day, however, she did see water in some of the cages. Humphries recalled the doors of some of the cages could not be opened because the feces were piled so high. Humphries testified approximately 138 or 139 rabbits were removed from appellant's property. Humphries explained a determination of the sex of the rabbits was not conducted prior to removing the animals because of the number of rabbits and the Humane Society's desire to remove the animals as quickly as possible.
On cross-examination, Humphries conceded male rabbits had been placed in cages with other male rabbits, which resulted in some of the animals being injured during the transporting to the fairgrounds. Humphries also acknowledged rabbits of different breeds were placed in cages together. Humphries noted, although she felt the conditions on June 3, 1998, were life threatening, her only option was to issue a warning to Mr. Brown because she had no way to do anything that day.
Tammy Durning, the assistant humane society officer, testified she and Humphries proceeded to appellant's property on June 3, 1998, to investigate a complaint of abuse. Durning verified she and Humphries did not enter the barn until Mr. Brown appeared and granted them permission to do so. Durning testified similarly to Humphries with respect to the observations once inside the barn. Like Humphries, Durning saw a crate of dead rabbits as well as the body of one rabbit on the floor of an aisle. She noted the living rabbits were dirty, appeared thin, and had mucus discharging from their eyes and noses. Durning did not see any food or water in the cages. Although Durning recalled the cages were appropriate sizes for the rabbits, she stated the cages were filled with feces and very dirty. In addition to the rabbits, the barn housed a number of dogs, penned in what appeared to be a pig sty, and chickens in a washtub.
Durning stated she, Humphries, and Sgt. McEnroe returned to appellant's property on June 4, 1998. After their knocks were met with no response, the group walked toward the pole barn. She testified no one entered the barn. Durning assisted Humphries in obtaining the search warrant on June 5, 1998, as well as the execution of the search warrant. At the property, she carried empty cages inside the barn and placed rabbits into the cages. She personally removed forty rabbits from appellant's property. Durning recalled the rabbits felt thin and were sticky with urine. Durning noticed the rabbits' conditions did not appear any different on June 5, 1998, from their conditions on June 3, 1998.
Beth Budavich, a licensed rehabilitator of wildlife, testified she was present on appellant's property on June 5, 1998, during the execution of the search warrant. After unloading cages from her van, Budavich proceeded to the barn to assess the situation. The smell inside the barn was so strong, Budavich had to leave the building. The dog warden gave her something to apply to her nose to help alleviate the odor. Back in the barn, Budavich began to remove rabbits from the cages. She recalled she removed at least fifty rabbits that day. Budavich testified the doors of some of the cages could not be opened due to the amount of feces piled inside the cages. When asked to describe how the rabbits felt, Budavich remembered one pen in particular which housed three rabbits. One of the rabbits was covered in sores and had little fur remaining on its body, while another rabbit was so thin, she could feel all the bones in its rib cage. Budavich described the barn as "[h]orrendous." She continued, "[t]here was broken glass and just junk. Cages were imbedded in feces. Some of them you couldn't see the rabbit in the cage it was so bad." T., Vol. I at 172. She recalled seeing little, if any, food and no water for the animals.Karen Slough, the Tuscarawas County Dog Warden, was also present during the execution of the search warrant. When asked to describe the odor she detected upon entering the barn, Slough answered, "Nasty, stinky, bad." T., Vol. I at 186. In order to get to the dogs housed inside the barn, Slough had to pass through the rabbit area. She observed "so much filth out there, I had never seen anything like it before." She continued, "[t]here were rows and rows of cages of rabbits and the feces in the cages was maybe a foot high." Id. at 187. Slough recalled she was also on appellant's property on June 4, 1998, at Humphries' request. On that day, Slough observed the situation and had general discussions with Humphries about whether or not to pursue the matter further. Slough testified no one entered appellant's home or the barn on that day. She could not recall whether anyone took photographs.
Sgt. McEnroe testified he became involved with the investigation on June 4, 1998. On that day, Lesli Humphries presented herself at the Tuscarawas County Sheriff's Department, seeking assistance in obtaining a search warrant for appellant's property. Sgt. McEnroe proceeded to appellant's property in order to speak with Mr. Brown. Humphries, Durning, and Slough arrived at the property shortly thereafter. The group remained on appellant's property for fifteen or twenty minutes. Sgt. McEnroe testified he did not see Humphries enter any of the structures on the property, although he acknowledged Humphries remained on the property after he departed. Thereafter, Sgt. McEnroe assisted Humphries in speaking with Judge Lile of the Tuscarawas County Court of Common Pleas in order to obtain a search warrant. Sgt. McEnroe was present on the property during the execution of the search warrant and prepared an inventory of the animals which were removed from the property.
On cross-examination Sgt. McEnroe indicated Humphries never informed him she had given Mr. Brown a written warning on June 3, 1998. The sergeant did not know a warning had been issued until June 5, 1998, when appellant and Mr. Brown showed the sergeant the progress they had made in accordance with the warning. Sgt. McEnroe noted, if he gives a written warning, which states a specific period of time in which to comply, he would have waited for the time period to run before obtaining as search warrant. The sergeant admitted he could not say whether the issuance of a written warning would have changed Judge Lile's opinion.
Dr. Theresa Heidel, a veterinarian, testified she examined appellant's rabbits on June 5, 1998, at the Tuscarawas County Fairgrounds, examining 138 rabbits in total. Describing her examination of the each rabbit, she stated she removed the rabbit from its cage and made a visual observation of its mouth, nose, ears, and hands to determine how much flesh was present on the particular rabbit. She also listened to the rabbit's lungs with a stethoscope and conducted gentle palpitations to determine if the rabbit was pregnant. Dr. Heidel proceeded to discuss her findings regarding rabbits A-J, the ten rabbits at issue herein.
With respect to rabbit A, Dr. Heidel testified the rabbit's fur was matted and filthy. The rabbit showed signs compatible with mange. Additionally, rabbit A was extremely emaciated and had mucus discharging from its nose. Dr. Heidel explained when she used the word "emaciated", she was describing a rabbit whose vertebra of the back bone could be felt and between whose ribs you could stick your fingers. Dr. Heidel stated a rabbit's fur could become matted due to diarrhea or something of that nature, but generally such condition was due to neglect. Dr. Heidel opined rabbit A had become emaciated from a lack of proper feeding. The nasal discharge was the result of an upper respiratory infection.
With respect to rabbit B, Dr. Heidel noted the rabbit's fur was severally matted around the rectum. This rabbit also suffered from severe nasal discharge, mange, and conjunctivitis. Dr. Heidel opined the condition of this rabbit was caused by neglect.Dr. Heidel recalled rabbit C was extremely emaciated and suffered a condition known as "wryneck," which is a disease caused by a bacteria. Dr. Heidel explained wryneck can cause an upper respiratory infection and, if not treated, move into the middle ear and cause a severe middle ear infection from which the rabbit would lose its equilibrium. Dr. Heidel stated the ear infection would be very painful for the rabbit. Because no reasonable remedy exists for wryneck, the only option is to euthanize the animal, which was done with rabbit C.
Rabbit D was also very emaciated and suffering from wryneck. Rabbit D was also ultimately euthanized.
With respect to rabbit E, Dr. Heidel recalled the rabbit's fur was so severely matted around the rectum the animal was unable to defecate, which resulted in the rabbit suffering from constipation. This rabbit also had severe nasal discharge, was emaciated, and was suffering from wryneck.
Dr. Heidel testified rabbit F was actually a doe with seven babies. The babies as well as the mother were "excruciatingly thin" and all emaciated. They were all suffering from conjunctivitis. Dr. Heidel conceded a mother rabbit with so many babies nursing on her was likely to be thin, however, she opined because the babies were also so thin, both the mother and babies needed supplemental food. Dr. Heidel concluded a lack of nutritional supplementation of food to the babies and the mother was the cause of the emaciated conditions of these animals. In order to sustain the babies, the mother needed to be eating at all times and as much as possible.
Dr. Heidel testified rabbit G was very emaciated and suffered from severe dehydration. The rabbit was also extremely anemic. Dr. Heidel explained the animal's gums, which are normally pink, were white. Dr. Heidel opined rabbit G showed signs of neglect caused by a lack of food and water.
With respect to rabbit H, Dr. Heidel testified the animal was suffering from wryneck, was emaciated, and had conjunctivitis. Dr. Heidel stated these conditions were caused by neglect.
Rabbit I likewise suffered from wryneck and was very emaciated. Additionally, this animal had a large amount of mucus discharging from its nose and eyes. Dr. Heidel opined the animal's condition was the result of neglect.
Finally, rabbit J had conjunctivitis, severe nasal discharge, and lung sounds consistent with pneumonia. Dr. Heidel testified the signs of neglect to this animal included its overall thinness, and the respiratory infection with a possibility of pneumonia. Regarding the overall condition of the rabbits, Dr. Heidel testified these conditions could not occur overnight, but rather were caused over a period of time, be it weeks or months.
On cross-examination, Dr. Heidel stated most of her dealings with rabbits in her practice had been primarily in the pet industry. The veterinarian acknowledged an owner's handling and treatment of rabbits which were pets would be different from an owner's handling and treatment of rabbits bred for meat. Dr. Heidel explained certain treatments and procedures were not necessarily available to production animals because cost becomes an issue. Simply put, the value of the animal does not justify the treatment.
Dr. Heidel stated she had no concerns about the fact the rabbits were not separated by sex or breed when transported to the fairgrounds. The veterinarian also explained the number one cause of wryneck was an untreated respiratory infection. She indicated a stressful or traumatic situation would not cause wryneck. The treatment of a rabbit with wryneck would be a permanent course of antibiotics, however, Dr. Heidel acknowledged such treatment could cause problems in meat rabbits. Dr. Heidel testified wryneck is a common disease and very easy to detect. She noted most production people would remove the animal from the rest of the herd to avoid exposing healthy animals to the bacteria which causes wryneck. The veterinarian conceded she would have considered appellant more responsible if she had segregated the wryneck rabbits. However, Dr. Heidel maintained appellant's allowing the animals to progress to the state they were in and allow them to continue to exist in that manner was inhumane.
Dr. Heidel stated a history of the rabbits might have been beneficial in her diagnosis, explaining such would have been helpful in determining the best and most effective way of treating the entire herd. On re-direct, Dr. Heidel noted a rabbit's history would have been helpful in determining the cause of a particular rabbit's emaciation. For example, knowing the animal's feeding patterns could assist in a determination of whether its emaciated state was caused by wryneck.
At the close of the State's case, appellant made an oral motion for acquittal pursuant to Crim. R. 29. The trial court denied the motion. Thereafter, appellant proceeded with the presentation of her case. Eleven witnesses, including appellant, appellant's husband, and appellant's son, testified on her behalf.
Samuel Waltz, Deputy Director of the Ohio Department of Agriculture, testified regarding the dry pack manure system, a method in which an animal lives on a bed of manure. Waltz stated, when utilizing this system, it was safe to allow manure to build up. Waltz testified the dry pack system is an acceptable industry standard. Upon viewing pictures of the pole barn, Waltz noted the structure had proper cross ventilation and was typical of commercial rabbitries. On cross-examination, Waltz conceded his last inspection of a rabbitry was ten years ago. He also testified the cages used in a dry pack manure system should have solid floors.
Daniel Widder, the branch manager of Tuscarawas Landmark Co-op, an agricultural retailer of feeds, fertilizers, and farm chemicals, testified appellant was a customer of the business. Widder detailed the amount of rabbit food purchased by appellant between January, 1998, and June, 1998. On January 6, 1998, appellant purchased 1000 pounds of rabbit feed, and another 1950 pounds on January 21, 1998. Appellant purchased a ton of rabbit feed on February 18, 1998, and an additional ton on March 20, 1998. On April 21, 1998, appellant purchased 1500 pounds of feed. On May 20, 1998, appellant purchased another 1500 pounds of feed. Widder, who is also an animal nutritionist, testified once a day feedings were normal, and a rabbit typically consumed between four and eight ounces depending on its breed. Because rabbits are nocturnal feeders, it would not be unusual to see empty feed dishes during the day. Widder explained rabbits do not feed without drinking; therefore, if feed remained in a bowl, one of two situations could be occurring. Either the animal was given too much food or not enough water. On cross-examination, Widder conceded although appellant purchased the rabbit feed, he could not verify the rabbits were actually fed.
Rachelle Hobart testified appellant had been her 4-H advisor for ten years and she had purchased numerous rabbits from appellant. Hobart stated she visited appellant's barn in early April, 1998, in order to purchase a rabbit. Hobart went into the barn and looked at approximately ten pens of rabbits. She noted nothing unusual about the barn. Upon looking at the photographs of the barn taken on June 3, 1998, Hobart testified the barn was in the same condition it was in when she visited in April. She also stated the conditions of appellant's barn were similar to the conditions of other barns she had visited. On cross-examination, Hobart admitted she only viewed five or ten rabbits and twenty-five babies, and because she was specifically looking for a baby, she did not pay particular attention to the other rabbits.
Michael Carpenter, a rabbit dealer who has known appellant for four or five years, testified he deals with appellant on a weekly basis. Carpenter testified he has observed Neil, appellant's son, feed and water the rabbits. Upon viewing the photographs of the barn taken on June 3, 1998, Carpenter saw nothing unusual or unhealthy about the interior of the structure. He recalled he visited appellant's barn a week or two before the incident, purchasing rabbits, and would not buy an animal if it were unhealthy, explaining an unhealthy rabbit would contaminate his herd. On cross-examination, Carpenter conceded he did not know when the search warrant had been executed; therefore, he could not say for certain when he last visited the barn. Carpenter admitted he did not know if there was food for the rabbits on June 3, 1998, because he was not appellant's property every day.
Barbara Butler, who has raised rabbits and guinea pigs as a hobby for the last thirty-three years and who is also a rabbit judge, testified regarding the feeding habits of rabbits. She noted she feeds her 111 rabbits once a day, in the evening. She explained it was not unusual for feeding bowls to be empty at the end of a twenty-four hour period. She also acknowledged it was not unusual to feel the ribs and backbone of rabbits of certain breeds. Butler maintained wryneck was not caused by a lack of food or water. On cross-examination, Butler testified she had never visited appellant's barn and her last contact with appellant was in the Fall, 1997.
Debra Jo Fair, who has known appellant for five years, testified she became acquainted with appellant through 4-H at the Tuscarawas County Fair. Fair and her children take 4-H rabbits. Over the course of her acquaintance with appellant, Fair and her children have had approximately sixteen of appellant's rabbits. Fair and her children visited appellant's barn during the first week of June, 1998. Fair testified she did not notice anything unusual about the barn. She observed rabbits eating and moving about their cages. She also saw food and water in the rabbit cages. Fair did not observe any rabbits which appeared to be sick. On cross-examination, Fair admitted she was wrong in stating she observed water bottles in the cages on the day of her visit.
Dr. Kathleen Bryant, a veterinarian, testified appellant contacted her shortly after the Humane Society seized the rabbits and requested Dr. Bryant view the rabbits at the Tuscarawas County Fairgrounds. Dr. Bryant stated she and appellant were unable to view the rabbits until July, 1998, due to her schedule. During the July visit, Dr. Bryant examined over 100 rabbits and observed a variety of problems, ranging from upper respiratory to thinness. Dr. Bryant noted a determination of the cause of rabbit's emaciation would be difficult to do simply conducting an examination without knowing its history. Diagnostic tests, including basic blood work, would assist in determining the cause of the emaciation. Dr. Bryant opined rabbits A-J could not be properly diagnosed without a history and diagnostic testing.
On cross-examination, Dr. Bryant testified she has had contact with appellant on a professional basis between twenty to thirty times. She has visited appellant's property six or seven times. During those visits, Dr. Bryant stated she never entered the rabbit barn. Dr. Bryant conceded she has never treated a rabbit with wryneck. The veterinarian stated she has examined rabbits in the past without knowing their entire histories and was able to make proper diagnosis. Dr. Bryant also admitted it would not be inappropriate to transport nine rabbits in one cage. Although Dr. Bryant would not concede the conditions of the ten rabbits at issue were the result of neglect, she acknowledged the living environment would need to be changed.
Neil Brown, appellant's son, testified his daily chores on the farm included feeding and watering the rabbits. He recalled feeding and watering the rabbits on June 3, 1998, and June 4, 1998. He stated he fed and watered the rabbits every night, seven days a week. On cross-examination, Neil stated it would take him an hour or more to feed and water the rabbits. In addition to this chore, Neil had other chores on the farm. Neil testified the amount of feces in some of the cages prevented him from opening the cage door, so he would bend the wires in order to feed the rabbits in those cages.
Marvin Brown, appellant's husband, testified he and appellant have been married for twenty years. Appellant raised rabbits before the couple was married and brought the rabbits with her to the farm after their marriage. Mr. Brown recalled he was working in the dairy barn on the morning of June 3, 1998, when he heard the dogs barking. He stepped out of the barn and observed a vehicle in the driveway. Upon approaching the vehicle, he noticed Humphries and Durning. Humphries informed Mr. Brown about the complaint the Humane Society had received about the rabbits. Mr. Brown gave Humphries and Durning permission to view the inside of the barn.
As he walked through the barn with the two women, Mr. Brown did not see anything unusual or any rabbits with wryneck. Mr. Brown admitted some of the rabbit pens, which he described as "temporary", were bad, but stated the others were basically clean. Mr. Brown explained appellant, who manages the operation of the rabbit barn, had jury duty in Federal Court the week prior to the Humane Society's visit. Due to the extended hours appellant was away from the home, the only thing done for the rabbits during that time was feeding and watering. Mr. Brown noted the barn had adequate ventilation. He conceded a smell existed, but explained the odor came from the carcass of a coyote, which was being left to rot in order for the Department of Natural Resources to study. He stated no ammonia smell existed in the building. Mr. Brown noted he observed approximately three dead rabbits in the barn during his walk through with Humphries and Durning. He denied the pile of dead rabbits Humphries described. He testified it was typical to have some animals die with the amount of rabbits in the barn. After Mr. Brown, Humphries, and Durning exited the barn, Humphries gave Mr. Brown a written warning. The warning provided appellant with four weeks to clean the barn. That evening and the following day, appellant and her children began to hang new pens in the barn.
On cross-examination, Mr. Brown testified he did not spend "much" time in the barn during the winter and spring of 1998. During the June 3, 1998 visit, Mr. Brown told Humphries the conditions in the barn were the worst they had ever been. He explained, in the Fall, 1996, appellant had increased the number of rabbits in her herd. Sometime in 1998, the family had decided to cut back from 138 to 56 rabbits. As a result, many rabbits were housed in temporary pens. Mr. Brown explained the sheer number of pens prevented keeping them properly cleaned. Although he knew the conditions were bad, he maintained all the rabbits were healthy. On re-direct, Mr. Brown stated the last time he was in the barn, which was the last week of May, he did not observe any rabbits suffering.
Appellant testified on her own behalf. She stated she had been in the rabbit business for thirty-four years and her business is registered through the American Rabbit Breeder's Association. Appellant testified Patty Pounds, the person who filed the complaint with the Humane Society, had not been in her barn for six or seven years. Appellant noted she is primarily responsible for the care of the rabbits, but her son, Neil, normally assists her. Appellant also explained she was on jury duty the week prior to the Humane Society visit and that commitment interfered with her responsibilities on the farm. She admitted, as a result, the barn was worse then what she wanted. Manure had built up in the barn, but she made sure the manure remained dry.
Appellant testified she had expanded the rabbit operation approximately 1 + years prior to the incident at issue. Recently, appellant and her husband decided to cut back the number of rabbits in the herd. Appellant purchased new cages and planned to replace everything in the barn. The extended operation was a partial cause of the condition of the barn. The temporary pens made it difficult to care for the rabbits in an efficient amount of time. The family made the decision to focus their time on other aspects of the farm operation and lower the size of the herd. Appellant maintained she did not neglect her animals, rationalizing, if she did, she would be unable to sell them. As part of the normal course of her rabbit operation, appellant frequently handled individual rabbits. She conducted a visual inspection of each rabbit every night to insure they were healthy and they were eating. During the two or three week prior to June 3, 1998, appellant noticed a couple of the rabbits were not eating. Ultimately, those rabbits died. Because she did not have time to bury them, she placed the bodies outside of the pens in order to use the pens for other rabbits. She also observed one of the rabbits had started to develop wryneck. She placed that rabbit and one disabled buck into what she classified as the "geriatric pen." Appellant stated she did not observe any rabbits with the conditions described by Dr. Heidel.
On cross-examination, appellant admitted she told one of the Humane Society officers and the dog warden the conditions in the barn were pathetic. She explained, although she knew the animals were taken care of, the Humane Society people would not understand. Appellant would not concede the conditions in the barn could result in detrimental health problems for the rabbits. Appellant asserted she did not have four rabbits in herd with wryneck, explaining if she had more than two rabbits at any one time with wryneck, she would have contacted rabbit specialists at Nebraska University or the Ohio State University. Appellant agreed, regardless of whether the rabbit is for production or a pet, all rabbits need food, water, and dry shelter.
On re-direct, appellant maintained the conditions in her rabbit barn on June 3, 4, and 5, 1998, did not result in any of the animals being deprived of food, water, or dry shelter. Appellant again admitted the barn was dirtier than she preferred, but she had taken steps to correct the problem.